UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

IN RE:

    MARK VEHMEYER WIBEL,                Case No. 12-01437-JRH
                                      Chapter 7 Proceeding
          Debtor.                   Hon. Daniel S. Opperman

_____/

BEACH COMMUNITY BANK,

    Plaintiff,

v.                                Adversary Proceeding
                                        Case No. 12-80313-JRH

MARK VEHMEYER WIBEL,

    Defendant.

_____/

<u>OPINION AND ORDER AFTER TRIAL</u>

PRESENT:    HONORABLE DANIEL S. OPPERMAN
                    United States Bankruptcy Judge

<u>INTRODUCTION</u>

The Plaintiff, Beach Community Bank, seeks a determination from this Court that the judgment entered in favor of it and against the Defendant, Mark Vehmeyer Wibel, is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The Defendant disagrees. At the February 13, 2014, trial, Mark Vehmeyer Wibel, Scott McCormick, Caroline Hartnett, and Tom Rosenbach testified. The Court makes certain findings of fact based upon the testimony of these individuals, as well as the Exhibits admitted at trial, all after careful consideration of the demeanor of the witnesses and their testimony.

1

FINDINGS OF FACT

The Parties

Mark Vehmeyer Wibel (the "Defendant") was a successful businessman for many years concentrating in the restaurant business. In particular, he controlled and had an ownership interest in a number of limited liability companies that owned and operated Carrabba's restaurants. By 2005, the Defendant decided to expand into general real estate development in Florida and began selling his interest in the various limited liability companies to Carrabba's Italian Grill, Inc. ("Carrabba's"). Initially, the Defendant sold his interest in four restaurants to Carrabba's in January, 2005, and subsequently sold his interest in an additional eleven restaurants on October 12, 2006. The Defendant continued holding an interest in three restaurants.

The Plaintiff, Beach Community Bank, (the "Plaintiff") was first involved with the Defendant in regard to the purchase of real estate in Regatta Bay, Okaloosa County, Florida. The Defendant executed the usual loan application and financial statement and subsequently signed a note and mortgage. This note was renewed in October, 2005, and then again in October, 2006. The Plaintiff does not contend that the Defendant did anything improper in regard to the 2005 initial loan or renewal. Instead, the facts surrounding the 2006 renewal form the basis of the Plaintiff's Complaint in this action.

2006 Events

In 2006, the Defendant began negotiating with Carrabba's to sell his interest in the remaining restaurants controlled by his limited liability companies. At the same time, the Defendant focused more attention on the development of Regatta Bay and essentially started phasing out as a restaurant operator. During this time, in addition to being involved in the

Regatta Bay development, the Defendant was also involved in the development of Seclusion Bay, a 15 acre development site that was intended to be a high-end condominium complex.   The Seclusion Bay project never got off the ground and, by September, 2008, the Defendant had completely withdrawn from participation in the project.

By the summer of 2006, the Defendant was in active negotiations with Carrabba's to sell his remaining interest in the restaurants.  At the same time, the Defendant submitted a new financial statement to the Plaintiff detailing his financial condition.

In that financial statement, the Defendant disclosed that he earned an annual salary of $350,000 as an owner/operator of restaurants.  This number is based upon a trailing twelve month average income he received from his restaurant business.  At the same time, he identified himself as a real estate developer.

The Defendant also disclosed various liabilities that he incurred, including obligations connected with his various business entities.  The Defendant testified at the February 13, 2014, trial that he discussed the disclosure of his various loans with Mr. McCormick and was told to exclude liabilities regarding the Plaintiff.  Mr. McCormick denies telling the Defendant that and neither gentleman could recall a specific conversation in which this discussion actually occurred. Regardless, the Defendant did not disclose approximately $2,500,000 of liabilities, including approximately $1,000,000 connected to his ongoing restaurant businesses and a $1,000,000 unsecured debt that he owed to Wachovia Bank in regard to the Seclusion Bay project.  Mr. McCormick testified that he was not aware of either obligation until much later.

The Defendant also listed his various assets and included his remaining restaurant interest with the value of $2,000,000.   Subsequently, this restaurant interest was sold to Carrabba's for $1,200,000.   While the Defendant continued to hold an interest in four restaurants, these interests were essentially worthless because of the lack of net operating income or other value. As testified by Mr. Rosenbach, the remaining restaurants had no value in 2006 because they were losing money and the value of the restaurants sold in October, 2006, was $1,200,000, not $2,000,000 as stated in the financial statements.

When the Defendant signed the financial statement, he acknowledged that the Plaintiff would rely upon the representations made by him in that statement.   The Defendant also represented: "This statement is true and correct in every detail and accurately represents the financial condition of the applicant(s) on the date given below."   The Defendant also stated that he would "promptly notify [the Bank] of any subsequent changes which would effect the accuracy of th[e] Statement."

After receiving the financial statement, Ms. Hartnett reviewed the financial statement and gave her assessment of the advisability of continuing the Defendant's loan.   Per her assessment, the Defendant's loan should have been renewed because it appeared that he was on a strong financial footing.   Ms. Hartnett did note some deficiencies in the financial statement, but she testified that these deficiencies were not such that she questioned the overall accuracy of the financial statement or would consider them to be "red flags".

By October, 2006, the Defendant had completed his negotiations for the sale of his interest in some of the Carrabba's restaurants and completed that sale on October 12, 2006. Thereafter, on December 23, 2006, the Defendant signed the renewal of his note with the Plaintiff, effective October 18, 2006.   When the Defendant signed the loan renewal documents,

4

he reaffirmed the accuracy of the August 15, 2006, financial statement by executing a loan agreement which stated: "Borrower's most recently delivered financial statements and reports are current, complete, true and accurate in all material respects and fairly represent borrower's financial conditions . . .   Borrower represents and warrants that all financial statements that Borrower provides to fairly represent Borrower's financial condition for the stated periods, and are current, complete, true and accurate in all material respects, including all direct and contingent liabilities, and that there have been no material adverse change in Borrower's financial condition, operations or business since the date the financial information was prepared."   Additionally, the promissory note stated: "I warrant that the financial statements and information I provide to you are or will be accurate, correct, and complete."

The Defendant did not notify the Plaintiff of any changes in his financial condition from August 15, 2006, through December 23, 2006.   Most notably, however, the Defendant's financial condition changed in that he was no longer earning any income as a restauranteur.   As he testified at trial, the Defendant anticipated servicing his obligation to the Plaintiff with developer fees that he would receive from his interest in Regatta Bay and Seclusion Bay.   As he admitted at trial, however, neither the Regatta Bay or Seclusion Bay entities had sufficient funds to pay the Defendant any developer fees and would have required loans from a bank in order to make such a payment.   As Mr. McCormick testified, the lack of a loan commitment or line of credit approving and funding developer fees makes any expectation of a developer fee speculative.

Additionally, the Defendant's interest in the restaurants that he valued at $2,000,000 on August 15, 2006, no longer existed, as he had sold those interests to Carrabba's on October 12, 2006, for approximately $1,200,000.   Finally, the Defendant's contingent liabilities that were

not included in the financial statements amounted to approximately $650,000 of annual debt service.

The Defendant's financial condition, coupled with the continuing deteriorating real estate values in Florida, caused the Defendant to default on his obligations to the Plaintiff in September, 2008.   Thereafter, the Plaintiff initiated collection actions against the Defendant and obtained a judgment against him in the amount of $540,599.87 in the Circuit Court for Okaloosa County, Florida.   The Defendant filed a petition seeking relief under Chapter 7 of the Bankruptcy Code with this Court on February 22, 2012.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

The issues in this matter arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, ---- U.S. ----, 131 S. Ct. 2594, 2608, 180 L.Ed.2d 475 (2011), and later by the United States Supreme Court in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014).   *See also Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

## SUMMARY OF APPLICABLE AUTHORITIES

A creditor seeking a judgment of nondischargeability must prove each of the elements of its complaint by a preponderance of the evidence.   *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).   Moreover, the Sixth Circuit has made clear that exceptions to discharge are construed strictly against the creditor.   *Rembert v. AT&T Universal Card Servcs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

6

Section 523(a)(2)(B) excepts from discharge debts incurred by use of a false statement in writing.   To prevail on a § 523(a)(2)(B) claim, a plaintiff must establish the following elements regarding the writing:

> (i) that [it] is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

*Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985).

A document that is "written, signed, adopted or used by the debtor" qualifies as a statement in writing under this section.   *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001).

Under the first element, a written statement is materially false if the information in it "offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit."   *Id.*, *citing In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).

The second element requires that the statement refer to the debtor's financial condition.

The third element requires the plaintiff/creditor to establish reasonable reliance on the written statement.   Reasonable reliance is not defined in the Bankruptcy Code.   In the Sixth Circuit, "whether a creditors' reliance was reasonable is a factual determination to be made in light of the totality of the circumstances."   *BankBoston Mortg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992), *cert. denied*, 113 S.Ct. 1272 (1995).

The Sixth Circuit has cited five factors to apply to determine reasonable reliance:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have

alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Ledford,* 970 F.2d at 1560.

The reasonableness requirement is not a rigorous one. "The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact." *Bank One, Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 76 (6th Cir. 1992). Although the requirement bars non-dischargeabililty in any case where the creditor's asserted reliance was so unreasonable as to negate the existence of actual reliance, the true purpose of the requirement is to screen out creditors who knowingly solicit false financial statements to set up exceptions to dischargeabililty. *See In re Ledford*, 970 F.2d at 1560.

The fourth element requires that the debtor make or publish the statement with "intent to deceive."

> The standard. . . is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied. . . . That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

*Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985) (citations omitted).

## ANALYSIS

### I.  Materially False Statements Regarding Debtor's Financial Condition

When submitted to the Plaintiff in August, 2006, the Defendant's statement regarding his income from the Carrabba's restaurants was correct in that he properly based that statement on the income he received over the trailing twelve months. However, by December, 2006, this

8

statement was clearly misleading in that the Defendant could not expect to receive any income from the restaurants that he sold in October, 2006.   While the financial statement did report that he was a real estate developer, the assertion that he could expect $350,000 or like income from such enterprise was speculative at best.   While the Defendant may have hoped that he could receive this money from either the Regatta Bay or Seclusion Bay projects, neither project had sufficient funding or financing to pay such a large fee.   Taking the testimony in favor of the Defendant completely, it was unreasonable for him to expect that level of income without a solid basis of operations.   In late 2006, neither Regatta Bay or Seclusion Bay were in a position to generate that type of income by their operations and each lacked loan commitments to generate sufficient income to the Defendant to support the income stated by him in his financial statements.

Second, although the $2,000,000 value placed on his Carrabba's restaurants interest in August, 2006, may have been optimistically estimated, by October 12, 2006, it was clear that his interest in the Carrabba's restaurants were nowhere near $2,000,000, as evidenced by the $1,200,000 that he received that day.   Clearly, by December 23, 2006, the Defendant did not have anywhere near $2,000,000 of value in any Carrabba's restaurants, especially since the remaining restaurants were valueless.

Third, the Defendant failed to report approximately $2,500,000 of contingent liabilities that he had when the financial statements were given to the Plaintiff in August, 2006.   Of those liabilities, approximately $1,000,000 could be explained away after the October, 2006, Carrabba's closings, but the remaining approximate $1,000,000 for Seclusion Bay remained. For added measure, these liabilities created an unreported contingent annual liability of the debt service in the amount of $650,000, a fact that is material in these circumstances.

9

The Court observed both the Defendant and Mr. McCormick carefully during their testimony regarding the statements allegedly made by Mr. McCormick to the Defendant in connection with preparing the financial statements.   While both gentlemen were generally credible, the Court, after observing their demeanor and listening to their testimony, finds Mr. McCormick's testimony more convincing.   First, Mr. McCormick was very adamant in his denial of any conversation as represented by the Defendant.   Although not discernable from a reading of the transcript, or even listening to an audio recording, the Court was impressed with Mr. McCormick's adamant stance in that regard.

Second, while the Defendant made statements that Mr. McCormick essentially gave him a free pass on this issue, his lack of detailed testimony as to when and where these conversations occurred was noteworthy.   Likewise, the Defendant was not as convincing in his testimony as Mr. McCormick.

Third, the Court could construe a scenario in which both Mr. McCormick and the Defendant were correct, as related to the Regatta Bay obligation owed to the Plaintiff only.   The Court cannot construe such a scenario, however, as to the Defendant's remaining obligations, namely Seclusion Bay.   The Plaintiff would not necessarily have been aware of these obligations by checking other sources.   For example, a diligent check of the public records by the Plaintiff in regard to Seclusion Bay would not have placed the Plaintiff on any notice of an obligation owed by the Defendant to Wachovia Bank because that obligation was not secured by a mortgage or like documents available to the public.   While the Court has considered this element in regard to its assessment of the testimony of Mr. McCormick and the Defendant, this point also impacts the issue of reliance and will not be repeated again.

Certainly by December, 2006, the Defendant was under an obligation to review, update,

10

and revise the financial statements supplied by him to the Plaintiff in August, 2006.   By December, 2006, the Defendant had significant changes in his financial condition that were not disclosed to the Plaintiff.    Moreover, as the documents signed by the Defendant in December, 2006, attest, he reaffirmed the accuracy of these statements, even though the statements were no longer true.   Accordingly, the Court finds that the Plaintiff has met the first element of its Section 523(a)(2)(B) action.

II.   Reasonable Reliance by Plaintiff

The *Ledford* court directs this Court to consider five factors to determine reasonable reliance.   First, the Court notes that there is no particularly close personal relationship or friendship between the Debtor and creditor, but instead there was a previous business dealing that appeared to be beneficial for both sides, which is relevant for the second *Ledford* factor.   As conceded by all at the trial, the original 2005 financial statements were accurate and the Defendant performed as expected.   The renewal of this loan, while perhaps not totally expected, was not unusual given the real estate development nature of the project in hand.   Likewise, as to the third *Ledford* element, the obligation was for commercial reasons, which, on its face, may require the Plaintiff to be more diligent.   As for the fourth factor, no apparent red flags appear, although Ms. Hartnett's report did raise some issues from her analysis.   While Ms. Hartnett did not give the Defendant a complete clean bill of financial health, she likewise did not identify significant problem areas that would cause anyone from the Plaintiff to investigate the financial statement further.

Finally, the fifth *Ledford* element requires the Court to determine whether a minimal investigation would have revealed the inaccuracy of the Defendant's representations.   In that regard, while the Wachovia Bank interest might not have been apparent, the record is also

11

devoid of any testimony that the Defendant told anyone associated with the Plaintiff of the sale of some of his assets in October, 2006, which would call into question not only his income, but his balance sheet.  In this regard, the Court notes that the Defendant's brief focuses in on the issue as a duty of the Plaintiff to inquire of the Defendant if the 2006 financial statements were still accurate or, for that matter, request an updated financial statement.  Although it is proper to ponder this issue, the Court concludes that with these facts, the Plaintiff did not have such a duty, especially given what appears to be an advantageous relationship beneficial to both sides. Moreover, although the Court is reluctant to rely upon boilerplate language in documents, both the August, 2006, and December, 2006, documents contained reaffirmation statements signed by the Defendant attesting to the accuracy of the documents.  Overall, the Plaintiff sufficiently investigated the Defendant's financial statement as evidenced by Ms. Hartnett's analysis and the review of the Defendant's documents and financial condition by the Plaintiff's employees, especially Mr. McCormick.   With this record, the Court finds that the Plaintiff reasonably relied upon the statements of the Defendant and the financial statements presented to the Plaintiff in 2006.   While perhaps a closer question than some actions, the Court finds that the Plaintiff has met the third element established by the Sixth Circuit in *Martin*.

III.   Submission of Financial Statement With Intent to Deceive

As established by *Martin*, the Court must determine if the Defendant made or published a statement with the intent to deceive.  To analyze this element, the Plaintiff must either prove that the Defendant intended to deceive the Plaintiff or that he acted with gross recklessness. Although not defined in the Bankruptcy Code, gross recklessness includes a lack of care whether a representation is true or false.  *See Norton v. Cole (In re Cole)*, 378 B.R. 215, 222 (Bankr. N.D. Ill. 2007); *Hayney v. Copeland (In re Copeland)*, 291 B.R. 740, 786 (Bankr. E.D. Tenn.

2003).   Here, the Defendant at best did little to confirm the accuracy of the statements when he supplied these statements to the Plaintiff in August, 2006, and did even less to confirm the accuracy of the statements in December, 2006.   Most notably, the Defendant did not tell the Plaintiff that he had sold eleven of the restaurants to Carrabba's, which impacted both his income and his amount of assets.   Likewise, certain liabilities were excluded from the 2006 statements, as well as the debt service for some of those liabilities.   While one omission alone would not be sufficient to support a finding of gross recklessness, all of these omissions taken together cause the Court to find that the Defendant, by not being more diligent in the August, 2006, submission and the subsequent December, 2006, restatement, acted with the requisite gross recklessness as stated in *Martin*.

CONCLUSION AND ORDER

The Court concludes that the Plaintiff has met all of the elements of an 11 U.S.C. § 523(a)(2)(B) action by a   preponderance of evidence.   Accordingly, the Court determines that the judgment entered by the Florida Okaloosa Circuit Court in the amount of $540,599.87 plus interest is excepted from discharge.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Judgment entered by the Florida Okaloosa Circuit Court in favor of the Plaintiff, Beach Community Bank, and against the Defendant, Mark Vehmeyer Wibel, in the amount of $540,599.87 plus interest is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B).

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order After Trial pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Daniel J. Broxup and Paul I. Bare.

**Signed: September 5, 2014**



Daniel S. Opperman
Hon. Daniel S. Opperman
United States Bankruptcy Judge